IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA M. BETTI,<br><br>    Plaintiff,<br><br>    v.<br><br>KAISER PERMANENTE AND KAISER FOUNDATION HEALTH PLAN,<br><br>    Defendants. | CIV-S-03-2678 DFL DAD<br><br>MEMORANDUM OF OPINION<br>AND ORDER |

Defendant Kaiser Foundation Health Plan ("KFHP") moves for summary judgment on plaintiff Angela Betti's claim that KFHP violated the Americans with Disabilities Act ("ADA") by refusing to provide her with a reasonable accommodation and that, as a result, she was constructively terminated from her position.[1]

I.

Betti was employed at the Kaiser facility in Stockton as a

---

[1] As there is a dispute over the identify of Betti's employer and which entity was acting at any given time, as discussed below, the court will refer to both Kaiser Foundation Health Plan and The Permanente Medical Group as "Kaiser" unless it is necessary to differentiate between the two entities.

1

psychiatric social worker's assistant, working towards licensure as a licensed clinical social worker. (Mot. at 2.) In the summer of 2002, Betti was diagnosed with post-traumatic stress disorder ("PTSD"). (Kramer Decl. Ex. 9 at 15.) During the summer and early fall of 2002, Betti's supervisor, Allison Kemps, received reports that Betti was coming in late and having difficulty completing her paperwork during her scheduled hours. (Def.'s SUF ¶ 10.) Betti missed an appointment with a client on October 15, 2002 and then missed a rescheduled appointment with the same client on October 28, 2002. (Kemps Decl. ¶ 7.) Betti also missed work on November 7, 2002, and on several occasions in December. (Id.)

A meeting was held between Kemps and Betti on January 14, 2003. (Def.'s SUF ¶ 14.) Betti's schedule, her tardiness, and her absences were discussed at the meeting. (Pl.'s Response to Def.'s SUF ¶ 14.) At this point, Betti was working four ten-hour shifts each week, starting at 8:30 a.m. on Monday and Wednesday mornings and 9:30 a.m. on Tuesdays and Thursdays. (Kemps Decl. ¶ 8.) During the meeting, Kemps suggested that Betti switch to five eight-hour shifts, which would allow her to come in later, but Betti rejected this suggestion. (Id. ¶ 9.) The meeting ended with an agreement that Betti would provide a proposed revised schedule that would allow her to come in later. (Kemps Decl. ¶ 10; Kramer Decl. Ex. 5 at 59.) However, Kemps did impose the restriction that Betti had to come in at 8:30 a.m. on Wednesday morning to be present for the mandatory weekly "Child

2

Team" meeting. (Kramer Decl. Ex. 5 at 148, 224.) Furthermore, Betti informed Kemps that she did not want to give up her Monday morning assignment at August Elementary School because she enjoyed the work and felt she could arrive on time on Mondays. (Id. at 122, 224-26.)

On February 4, 2003, another meeting was held, with Kemps, Betti, and Betti's union steward and clinical supervisor, Larry Meade. (Kemps Decl. ¶ 11, Ex. 3.) At the meeting, the parties worked together to modify Betti's schedule. (Id.) Betti submitted a new proposed schedule on February 6, 2003, which pushed back her start time to 10:30 a.m. on Tuesday and Thursday. (Kramer Decl. Ex. 5 at 61.) Kemps immediately approved the schedule, but informed Betti that, for administrative reasons, the schedule could not be officially implemented until April. (Kemps Decl. ¶ 13.) In the meantime, Kemps offered to remove all of the early morning appointment slots from Betti's schedule, but Betti declined this offer. (Id.)

On Wednesday February 19, 2003, Betti did not arrive at work on time and missed the 8:30 a.m. meeting. (Id. ¶ 15.) Betti also missed a client appointment scheduled at 9:45 am. (Id. ¶ 16.) Another provider, Adam Pollack, treated the patient after noticing that Betti had not arrived. (Kramer Decl. Ex. 11 at 31-22, Def.'s Ex. G at 39-41.) After twice attempting to contact Betti, Kemps told the receptionist to cancel the remainder of Betti's appointments for the day. (Kemps Decl. Ex. 7.) Betti woke up at 11:00 a.m., immediately called the Kaiser

receptionist, and was told that Kemps had cancelled the remainder of her schedule. (Kramer Decl. Ex. 5 at 93.)  Betti then contacted Kemps, who told her not to come into work for the remainder of the day and directed her to obtain a note from her physician explaining her tardiness. (Id. at 93-94.)  Betti returned to work the next day with the requested note. (Kemps Decl. ¶ 18

Kemps convened another meeting with Betti and Meade on February 25, 2003, at which Kemps announced her intent to proceed with a "corrective action plan" ("CAP") because of Betti's "gross misconduct" in failing to call or appear for work on February 19, 2003. (Id. ¶ 19, Ex. 9.)  Meade protested that this discipline was excessive and, after some arguing back and forth, Betti and Meade left the meeting. (Id.)

Kemps presented Betti with the CAP at a March 6, 2003 meeting, where Meade was also present. (Id. ¶ 20.)  The CAP provided, among other things, that Betti would arrive on time "in all circumstances." (Id. Ex. 10.)  Betti refused to sign the CAP and indicated that she intended to file a union grievance to protest the discipline. (Id. Exs. 10-11.)

On March 26, 2003, Betti arrived at work at least 30 minutes late, missing the weekly Wednesday meeting. (Kramer Decl. Ex. 6 at 166-67.)  The following day, Betti was at least 20 minutes late, arriving at 10:50 or 11:00 a.m., when her modified schedule required her to arrive at 10:30 a.m.. (Id. at 167-68.)  Kemps then notified Betti in writing that there would be further

4

disciplinary proceedings.  (Kemps Decl. ¶ 21, Ex. 12.)  On March 31, 2003, Betti went on medical leave. (Def.'s SUF ¶ 30.)

Starting in July 2003, Betti's counsel and counsel for The Permanente Medical Group ("TPMG"), Susan Spurlack, began to correspond about Betti's return to work.  (Supplemental Alden Decl. Ex. D.)  On August 21, 2003, Betti's psychiatrist, Dr. Jurkowski, indicated that Betti could return to work if two conditions were met: (1) if she were given an afternoon schedule for six months to a year; and (2) if she were transferred to a different clinic.[2]  (Kemps Decl. Ex. 13.)

Counsel for Kaiser responded to these requests for accommodation by letter on October 6, 2003.  (Supplemental Kramer Decl. Ex. 13.)  Counsel stated that an afternoon schedule could be accommodated, with the exception of the Wednesday morning meeting.  (Id.)  The letter indicated that, despite Betti's argument to the contrary, attendance at the Wednesday meeting had not been waived for other staff members.  (Id.)  However, the letter invited Betti to submit any "other facts" she believed were relevant to the Wednesday meeting.  (Id.)

Counsel also responded that the second request, for a transfer to a different facility, was not required under state or federal law.  (Id.)  She also indicated that Betti could apply for a transfer, but that there were currently no openings Betti

---

[2] Dr. Jurkowski recommended the transfer based upon his opinion that Kemps exacerbated or triggered Betti's PTSD symptoms.  (Def.'s Ex. E at 48-49.)

was qualified to fill.  (Id.)

Between October 6, 2003 and November 20, 2003, counsel for both parties apparently had conversations regarding Betti's transfer, and Kaiser agreed to assist in forwarding Betti's "application for transfer to either the South Sacramento or Modesto Kaiser facilities." (Id. Ex. 14.)  However, counsel for Kaiser indicated that Betti would not be placed at the top of the list for a transfer.  (Id.)  In a letter dated November 22, 2003, Betti's counsel objected to this position and argued that Betti was entitled to expedited consideration because the transfer was a necessary accommodation.  (Id.)  Betti's counsel reiterated this argument in correspondence on December 3, 2003 and December 4, 2003.  (Id. Exs. 15, 16.)

On January 5, 2004, counsel for Kaiser informed Betti's counsel that it had run a search for vacant positions at its Manteca, Modesto, South Sacramento, and Sacramento facilities, and found no current vacant positions for a psychiatric social worker without licensure.  (Supplemental Alden Decl. Ex. C.)  The letter also indicated that Kaiser had no obligation to transfer Betti to an open clinical social worker position, which requires licensure.  (Id.)  However, Kaiser indicated that it was willing to explore positions in locations other than those indicated or other job classifications for which Betti might be qualified. (Id.)  Kaiser again reiterated, on January 13, 2004, that it had searched for vacant positions, that no vacant positions were currently available, and that it was willing to look at other

6

positions and locations.  (Id., Ex. B.)  Kaiser also indicated that it would notify Betti if a position became available.  (Id.)

Betti's first amended complaint, naming KFHP as a defendant, was filed on January 21, 2004 and raises two claims: (1) that KFHP failed to provide a reasonable accommodation for Betti's disability in violation of the ADA, 42 U.S.C. §§ 12101 et seq; and (2) that KFHP refused to provide a reasonable accommodation for Betti's disability in violation of the California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code §§ 12900 et seq.  Defendant KFHP moves for summary judgment on both claims.

## II.

KFHP argues that summary judgment is appropriate for three reasons: (1) Betti could not perform the essential functions of her job, with or without modifications; (2) KFHP provided reasonable accommodations to Betti; and (3) KFHP was not Betti's employer.  (Mot. at 2.)

The ADA prohibits employment discrimination against qualified individuals with disabilities and requires employers to make "reasonable" accommodations for the known physical or mental limitations of such individuals.  42 U.S.C. § 12112.  A qualified individual with a disability is one who "with or without reasonable accommodation, can perform the essential functions of the employment."  Id. § 12111.  To prevail in a suit asserting prohibited discrimination, a plaintiff must demonstrate: (1) that she has a disability; (2) that she is capable of performing the essential functions of her position; and (3) that she was denied

7

a reasonable accommodation. <u>Kennedy v. Applause, Inc.</u>, 90 F.3d 1477, 1481 (9th Cir. 1996). The same test is applied to FEHA claims. <u>Brundage v. Hahn</u>, 57 Cal.App.4th 228, 235, 66 Cal.Rptr.2d 830 (1997); <u>Humphrey v. Mem'l Hosp. Ass'n</u>, 239 F.3d 1128, 1133 n.6 (9th Cir. 2001).

### A. Essential Function

KFHP argues, and Betti concurs, that regular and predictable attendance is an essential job function of a psychiatric social worker's assistant. (Mot. at 10; Def.'s Ex. D. at 139, 161, 441.) However, there is a genuine dispute of material fact as to whether Betti can perform this essential job function. At the time she left on medical leave, Betti's modified schedule had not yet been fully implemented. Betti's clinical supervisor, Meade, has expressed an opinion that Betti could have performed the essential functions of her position, including, presumably, arriving on time, with the requested accommodations. (Meade Decl. ¶ 8.) Additionaly, Betti argues that, at her current position, she has adhered to a schedule like the one she requested from Kaiser. (Opp'n at 6-8.) Finally, Kaiser's willingness to accept Betti back in August 2003 with an afternoon schedule undercuts its argument that Betti could not perform the essential functions of her position. Because there is a genuine issue of material fact as to whether Betti could arrive on time under a reasonably modified schedule, summary judgment is DENIED on this basis.

\\\

B. Reasonable Accommodation

In an ADA case, the plaintiff bears the burden of showing the existence of a reasonable accommodation that would permit her to perform the essential functions of her position. U.S. Airways v. Barnett, 535 U.S. 391, 401, 122 S.Ct. 1516 (2002). Upon such a showing, the burden shifts to the defendant to show that the accommodation is unreasonable on the facts presented. Id. at 402. Reassignment to a vacant position is identified by the ADA and its implementing regulations as a reasonable accommodation. 42 U.S.C. § 12111(9); 29 C.F.R. Pt. 1630 App. (2005). While an employer need not create a new position for a disabled employee or promote an employee who is not otherwise qualified for the vacant position, the employer must consider the employee for vacant positions. See, e.g., Buckingham v. United States, 998 F.2d 735 (9th Cir. 1993) (holding, under the Rehabilitation Act, that a request for a transfer to the same job at a different location is not per se unreasonable); Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1121 (9th Cir. 2000) (holding that reassignment is a reasonable accommodation and that, in the absence of an undue hardship, a disabled employee should be given the priority for reassignment over non-disabled applicants), *rev'd on other grounds,* U.S. Air, Inc. v. Barnett, 535 U.S. 391, 401, 122 S.Ct. 1516 (2002); Gile v. United Airlines, Inc., 95 F.3d 492 (7th Cir. 1996) (reversing the district court's grant of summary judgment and holding that the ADA required United Airlines to consider transferring the plaintiff to a position outside her department);

9

1  Burns v. Coca-Cola Enterprises, Inc., 222 F.3d 247 (6th Cir.
2  2000) (discussing the obligation to transfer an employee, but
3  ultimately holding that the plaintiff had not met his burden of
4  requesting a transfer, as required by company policy); Smith v.
5  Midland Brake, Inc., 180 F.3d 1154 (10th Cir. 1999) (holding that
6  an employer has an obligation to reassign a disabled employee to
7  a vacant position, not merely consider the employee alongside
8  other applicants).  The ADA also imposes a continuing obligation
9  on the employer to engage, in good faith, in an interactive
10 process with a disabled applicant to attempt to identify and
11 implement a reasonable accommodation.  Humphrey, 239 F.3d at
12 1137-38.

13      Although Kaiser adopted the erroneous position that it was
14 not required to give Betti priority in applying for a vacant
15 position, it did, nonetheless, engage in the interactive process
16 and attempt to reasonably accommodate Betti.  In October and
17 again in January, Kaiser communicated that it had searched for
18 job openings and that there were no vacant positions in the job
19 classification Betti occupied and in the job locations Betti
20 desired.  (Supplemental Kramer Decl. Ex. 13; Supplemental Alden
21 Decl. Exs. B, C.)  Kaiser indicated a willingness to search other
22 locations and job classifications, if Betti so desired.  (Id.)
23 Kaiser was not required, as Betti's counsel requested in her
24 December 3, 2003 correspondence, to convert an open clinical
25 position to a psychiatric social worker assistant position.
26      In arguing that Kaiser could have reasonably accommodated

her request for a transfer, Betti points to deposition testimony indicating that other employees have been transferred and to two job listings from Kaiser's external job search.[3]  (Opp'n at 11.) However, the deposition testimony does not rebut Kaiser's evidence that, at the time Betti sought to transfer, there were no vacant positions available.

   Nor do the job listings assist Betti.  The first listing is for a clinical social worker position, a vacancy for which Betti was not qualified. (Betti Decl. Ex. 3.)  Although Betti was qualified to fill the second position, for a psychiatric social worker assistant, this position was located in Richmond.  (Id.) The correspondence between Betti's counsel and Kaiser indicates that Betti expressed a desire to transfer to South Sacramento or Modesto. (Supplemental Kramer Decl. Ex. 14.)  It appears that Kaiser voluntarily expanded its search to the Sacramento and Manteca locations. (Supplemental Alden Decl. Ex. C.)  There is nothing in the record indicating that Betti had a desire, in late 2002 or early 2003, to transfer to the Richmond facility, or that she communicated such a desire to Kaiser.  Once a disabled employee has requested the accommodation of a transfer, "both parties have an obligation" to proceed with a "reasonably interactive process" to identify an appropriate alternative position.  Smith, 180 F.3d at 1171-72.  If Betti would have accepted a position in Richmond, she had an obligation to inform

---

[3] Although Betti's declaration appears to include three separate listings, the second and third listing are for the same position (Job Number RH.0300026).  (Betti Decl. Ex. 3.)

11

Kaiser of this fact as part of the interactive process.

Kaiser fulfilled its obligations under the ADA by searching for an open position for Betti at the locations she requested, offering to broaden its search, and promising to inform Betti if a position became available.  Kaiser cannot be held liable merely because its search for a reasonable accommodation proved fruitless.  Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001).  Kaiser has met its burden of showing that, on the particular facts of this case, the requested transfer was not a reasonable accommodation.  Therefore, summary judgment is GRANTED on this basis.

### C. The Identity of Betti's Employer

KFHP alleges, alternatively, that summary judgment should be granted because it is not Betti's employee.  In support of this position, it offers a declaration that TPMG is a separate legal entity and that TPMG, not KFHP, was Betti's employer.  (Alden Decl. ¶¶ 1-11.)  Additionally, it provides documents produced in discovery by Betti, all of which list TPMG as Betti's employer.  Supplemental McNamara Decl. Ex I.)  Betti's evidence on this point does not establish a genuine dispute of material fact.  At most, Betti's documentation is consistent with employment by either KFHP or TPMG.  (Betti Decl. Ex. 1.)  While Betti apparently labored under the mistaken belief that her employer was Kaiser Permanente, an entity that does not actually exist, this does not affect the legal status of TPMG as her employer.

12

Therefore, summary judgment is GRANTED on this basis as well.[4]

### III.

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: 7/25/2005

*(signature)*

DAVID F. LEVI
United States District Judge

---

[4] Betti requested permission to amend her complaint to name TPMG. (Opp'n at 12-13.) Under Fed.R.Civ.P. 15, leave to amend should be freely granted whenever justice so requires. However, leave to amend may be denied where the amendment would be futile. Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995). Because the court finds, as a matter of law, that Betti was not denied a reasonable accommodation, amendment would be futile. Therefore, the motion to amend is DENIED.